**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**MICHAEL A. DOBSON,**

Plaintiff,

v. Civil Action No. **3:22CV132**

**HAROLD CLARKE, *et al.*,**

Defendants.

**MEMORANDUM OPINION**

Michael A. Dobson, a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this 42 U.S.C. § 1983 action.[1] By Memorandum Order entered on October 31, 2022, and again on December 13, 2022, the Court directed Dobson to file a Particularized Complaint. (ECF Nos. 28, 33.) In the Court's Memorandum Orders, the Court warned Dobson that if he failed to submit an appropriate Particularized Complaint that comported with the joinder requirements set forth in each Memorandum Order, the Court would drop all defendants not properly joined with the first named defendant. (ECF No. 33, at 3–4.)[2] Dobson filed a Particularized Complaint. (ECF No. 35.) The matter is before the Court for evaluation pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A,

---

[1] The statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[2] The Court employs the pagination assigned by the CM/ECF docketing system. The Court corrects the capitalization, spelling, and punctuation from Dobson's submissions.

Federal Rule of Civil Procedure 20(a),[3] and Dobson's compliance with the Court's October 31, 2022, and December 13, 2022, Memorandum Orders.

## I. PRELIMINARY REVIEW

Pursuant to the Prison Litigation Reform Act ("PLRA"), this Court must dismiss any action filed by a prisoner if the Court determines the action (1) "is frivolous" or (2) "fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2); *see* 28 U.S.C. § 1915A. The first standard includes claims based upon "an indisputably meritless legal theory," or claims where the "factual contentions are clearly baseless." *Clay v. Yates*, 809 F. Supp. 417, 427 (E.D. Va. 1992) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)). The second standard is the familiar standard for a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Martin*, 980 F.2d at 952. This principle applies only to factual allegations, however, and "a court considering a motion to dismiss

---

[3] Federal Rule of Civil Procedure 20(a) provides:

> **(2)** ***Defendants.*** Persons . . . may be joined in one action as defendants if:
> **(A)** any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
> **(B)** any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a)(2).

can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

The Federal Rules of Civil Procedure "require[ ] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Plaintiffs cannot satisfy this standard with complaints containing only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted). Instead, a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level," *id.* (citation omitted), stating a claim that is "plausible on its face," *id.* at 570, rather than merely "conceivable." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp.*, 550 U.S. at 556). In order for a claim or complaint to survive dismissal for failure to state a claim, therefore, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002); *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)). Lastly, while the Court liberally construes *pro se* complaints, *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978), it does not act as the inmate's advocate, *sua sponte* developing statutory and constitutional claims the inmate failed to clearly raise on the face of his complaint. *See Brock v. Carroll*, 107 F.3d 241, 243 (4th Cir. 1997) (Luttig, J., concurring); *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

## II. JOINDER

The Federal Rules of Civil Procedure place limits on a plaintiff's ability to join multiple defendants in a single pleading. *See* Fed. R. Civ. P. 20(a). "The 'transaction or occurrence test' of [Rule 20] . . . 'permit[s] all reasonably related claims for relief by or against different parties to be tried in a single proceeding. Absolute identity of all events is unnecessary.'" *Saval v. BL Ltd.*, 710 F.2d 1027, 1031 (4th Cir. 1983) (quoting *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974)). "But, Rule 20 does not authorize a plaintiff to add claims 'against different parties [that] present[ ] entirely different factual and legal issues.'" *Sykes v. Bayer Pharm. Corp.*, 548 F. Supp. 2d 208, 218 (E.D. Va. 2008) (alterations in original) (quoting *Lovelace v. Lee*, No. 7:03CV00395, 2007 WL 3069660, at *1 (W.D. Va. Oct. 21, 2007)). "And, a court may 'deny joinder if it determines that the addition of the party under Rule 20 will not foster the objectives of [promoting convenience and expediting the resolution of disputes], but will result in prejudice, expense, or delay.'" *Id.* (quoting *Aleman v. Chugach Support Servs., Inc.*, 485 F.3d 206, 218 n.5 (4th Cir. 2007)).

In addressing joinder, the Court is mindful that "the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966). This impulse, however, does not provide a plaintiff free license to join multiple defendants into a single lawsuit where the claims against the defendants are unrelated. *See, e.g.*, *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007); *Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997). Thus, "[a] buckshot complaint that would be rejected if filed by a free person—say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D failed to pay a debt,

and E infringed his copyright, all in different transactions—should be rejected if filed by a prisoner." *George*, 507 F.3d at 607.

"The Court's obligations under the PLRA include review for compliance with Rule 20(a)." *Coles v. McNeely*, No. 3:11CV130, 2011 WL 3703117, at *3 (E.D. Va. Aug 23, 2011) (citing *George*, 507 F.3d at 607).

> Thus, multiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2. Unrelated claims against different defendants belong in different suits, not only to prevent the sort of morass that these complaints have produced but also to ensure that prisoners pay the required filing fees.

*Id.* (citing 28 U.S.C. § 1915(g); *Showalter v. Johnson*, No. 7:08CV00276, 2009 WL 1321694, at *4 (W.D. Va. May 12, 2009)).

## III. SUMMARY OF ALLEGATIONS AND CLAIMS

In his Particularized Complaint, Dobson names the following sixteen individuals as Defendants: Harold Clarke, Director; Dr. Herrick, Director; Bernard Booker (BKCC); Rickey White (R.O.S.P.); Dr. Thompson, (B.K.C.C.); Dr. Quinn (B.K.C.C.); Ann-Marie White, (A.G.'s Office); Charisse M. Mullen (A.G.'s Office); Nurse A.J. Williamson (B.K.C.C.); Sgt. Brown (B.K.C.C.); Mailroom Manager (B.K.C.C.); Major King (R.O.S.P.); Officer Cox (R.O.S.P.); K-9 Officer (R.O.S.P.); and Lt. Williams (ROSP) ("Defendants"). (ECF No. 35, at 1–2). Dobson's Particularized Complaint appears to be a general airing of grievances during his incarceration at several institutions between 2017 and 2022. The Particularized Complaint is rambling, composed of Dobson's conclusions without a great deal of useful detail, and jumps around in time. It is difficult to discern exactly why Dobson believes Defendants violated his constitutional rights. Dobson also fails to clearly indicate at what institution the alleged conduct occurred. The list of Defendants includes employees of the Virginia Department of Corrections, Buckingham

Correctional Center, Red Onion State Prison, and the Office of the Attorney General. (ECF No. 35, at 1–2.)

Dobson first has a "Statement of Facts" section where he also sets forth his claims for relief with the supporting facts for each claim. (*Id.* at 2–12.) Dobson next has a lengthy section where he lists each Defendant and then identifies the particular constitutional right he believes that each Defendant violated. (*Id.* at 12–25.) The Court construes Dobson to raise the following claims in his Particularized Complaint:

Claim One: Defendants "denied 1st Amendment Rights and 4th Amendment rights" when they opened his mail and removed five pages on December 3, 2018, and charged him postage. (*Id.* at 2–4.)

Claim Two: "Denial of 8th Amendment rights: deliberate indifference to mental and medical conditions." (*Id.* at 4.)

Claim Three: Dobson experienced "1st Amendment and 8th Amendment Retaliation" violations while incarcerated in Red Onion State Prison. (*Id.* at 9–12.)

In the section where Dobson identifies the constitutional rights that each Defendant violated, he refers back to one of the three claims listed above. Dobson also adds additional facts that support and appear to expand each claim. (*See, e.g.*, *id.* at 24–25 (arguing that "K-9 Officer spilled cool aid all over my law work and book . . . this was clear retaliation," "Officer Cox slammed my head in the tray door" in retaliation for "this law suit," and referring to Claim Three). The Court does not set forth each act that Dobson claims falls under Claims One and Three, because as discussed below, these claims are improperly joined.

Dobson fails to identify any relief that he is seeking. (*Id.* at 26.) In his original Complaint, however, Dobson indicated that he sought "an oversight commission of D.O.C., the email stolen, redress, $750,000." (ECF No. 1, at 2.)

## IV. DISMISSAL OF IMPROPERLY JOINED CLAIMS

The Court now proceeds with the analysis outlined in the October 31, 2022, and December 13, 2022, Memorandum Orders. (*See* ECF No. 33, at 3–4.) The first named defendant in the body of the Particularized Complaint is Dr. Thompson under Claim Two. (ECF No. 35, at 4.) Dr. Thompson is named in Claim Two along with Dr. Quinn and Nurse Williamson. (*Id.* at 6–7.) These three medical defendants are not named in any other claim.[4] Claim Two alleges a deliberate indifference to Dobson's serious medical needs. Accordingly, the Court will proceed with the analysis it explained in the October 31, 2022, and December 13, 2022, Memorandum Orders, and

[4] The Court notes that Dobson did not name Defendants Clarke, Booker, and Herrick in his statement of the facts or in the body of his allegations for Claim Two. However, in the section where he identifies constitutional rights violated, Dobson alleges, "Clarke had sufficient causal connection between the officials' acts and the omission of the MMPI-2 test and injury caused by allowing 3 years to pass without treatment." (ECF No. 35, at 13.) Similarly, Dobson indicates that Defendant Booker should be responsible because he "was fully aware of all the actions of his staff." (*Id.* at 15.) Dobson claims that "Director Herrick's office found Plaintiff's complaint unfounded" and that he sets health services policies. (*Id.* at 17–18.)

In order to state a viable claim under 42 U.S.C. § 1983, a plaintiff must allege that a person acting under color of state law deprived him or her of a constitutional right or of a right conferred by a law of the United States. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 658 (4th Cir. 1998) (citing 42 U.S.C. § 1983). "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (citations omitted). To state a legally sufficient claim for an alleged violation of a federal constitutional right, "[a] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* Accordingly, the plaintiff must allege facts that affirmatively show "that the official charged acted personally in the deprivation of the plaintiff['s] rights." *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (internal quotation marks omitted); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (noting that liability is "personal, based upon each defendant's own constitutional violations"). Dobson's allegations against Defendants Clarke, Booker, and Herrick are too vague and conclusory to state a claim for relief or to show that either defendant was personally involved in the deprivation of his Eighth Amendment rights with respect to his mental health care.

Dobson also refers to Claim Two under the section for Ann-Marie White and Charisse Mullen, (ECF No. 35, at 16–17), and for Warden Rickey White, (*id.* at 21), but other than the reference, Dobson does not allege any facts in support of the denial of adequate mental health care claim he alleges in Claim Two.

"the Court will drop all defendants not properly joined with the first named defendant."[5] (*See* ECF No. 33, at 4.)

Claim Two alleges a deliberate indifference to Dobson's serious medical or mental health needs. Claim One pertains to an alleged removal of pages from his legal mail and the fact that Dobson was charged money to send his mail. (*Id.* at 2–4.) Claim Three alleges that Dobson was retaliated against in various ways for attempting to investigate the missing pages of his mail. (*Id.* at 9–12.) The remaining claims—Claims One and Three—are different types of claims, alleging different conduct, on different dates, against different defendants. Thus, it is apparent that Dobson has failed to articulate a common question of law and fact for all of the named defendants, and that Dobson's various causes of action do not arise "out of the same transaction, occurrence, or series of transactions or occurrences." Fed. R. Civ. P. 20(a).[6] Instead, Dobson has submitted the sort of "mishmash of a complaint" that the rules governing joinder aim to prevent. *Jackson*, 2010 WL 724023, at *7 (quoting *George*, 507 F.3d at 607). As such, permitting the joinder of Claims One and Three will not promote the objectives of Rule 20 or judicial efficiency. *See id.* at *8 n.10.

For the reasons set forth above, Dobson's Particularized Complaint "comprises multiple law suits, rather than one suit." *Id.* at *8 (quoting *Canada v. Ray*, No. 7:08cv00219, 2009 WL 2448557, at *2 (W.D. Va. Aug. 10, 2009)).[7]

---

[5] "Such a procedure fosters the objectives of the Rules of Civil Procedure[ ] of expediting the resolution of disputes, without further squandering scarce judicial resources on 'disputes that are not structurally prepared to use those resources efficiently.'" *Jackson v. Olsen*, Civil Action No. 3:09cv43, 2010 WL 724023, at *8 n.10 (E.D. Va. Mar. 1, 2020) (quoting *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1279–80 (11th Cir. 2006)).

[6] Dobson argues that his claims "are 'not' entirely different in factual and legal issues" because "they all spring from the same root." (ECF No. 35, at 26.) Simply because his claims stem from his experiences during his incarceration do not make them properly joined.

[7] Through the PLRA, Congress sought to ensure "that the flood of nonmeritorious [prisoner] claims does not submerge and effectively preclude consideration of the allegations with

Accordingly, Claims One and Three will be DISMISSED WITHOUT PREJUDICE because they are improperly joined. Defendants Clarke, Herrick, Booker, Rickey White, Ann-Marie White, Mullen, Brown, Mailroom Manager, King, Colling, Cox, K-9 Officer, and Williams are dismissed from the action because the claims against them are improperly joined. Thus, the action proceeds solely on Claim Two against Defendants Thompson, Quinn, and Williamson, to which the Court now turns.

## V. EIGHT AMENDMENT CLAIM

### A. Dobson's Allegations in Claim Two

Claim Two is hardly concise or clear. Dobson contends that Defendants Dr. Thompson, Dr. Quinn, and Nurse Williamson were deliberately indifferent to his serious mental health needs in violation of the Eighth Amendment. Dobson alleges as follows:

> 1) The Defendants allowed Plaintiff to go untreated for mental health condition that turned into serious medical health conditions to avoid liability for injuries caused by a state created danger claim listed above their deliberate indifference to mental health condition led to medical health condition 1) high blood pressure, 2) vertigo, 3) globous, and 4) hair loss. The mental health conditions 1) PTSD, 2) panic disorder and, 3) anxiety.
>
> 2) Plaintiff was diagnosed by a MMDI-2 mental health test to need treatment on 2/25/2019, ordered by Dr. Thompson on 2/15/19. However, Dr. Thompson never told Plaintiff of the findings of the test nor did Dr. Thompson list finding[s] in Plaintiff['s] medical file, or list finding[s] in D.O.C. CORIS.
>
> 3) Dr. Thompson, along with all the mental health and medical staff were aware of Plaintiff's state created danger claim against staff at BKCC, because each few months Plaintiff was brought before the ICA where all facility heads met with Plaintiff and talked about the claim and why I was in the hole and what was being done.
>
> 4) The mental health and medical staff failed to ensure adequate care and diagnos[e] Plaintiff's medical health conditions. The Virginia Department of Corrections operating procedure ha[s] clear safeguards in place to allow the medical

merit." *Jones v. Bock*, 549 U.S. 199, 203 (2007) (citing *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)). The requirement that inmates must pay the full filing fee for each separate suit, *see* 28 U.S.C. § 1915(b)(1), is one of the PLRA's key "reforms designed to filter out the bad claims and facilitate consideration of the good." *Id.* at 204. To allow an inmate, such as Dobson, to "package many lawsuits into one complaint exempts him from such a cost, benefit analysis and thus undercuts the PLRA." *Canada*, 2009 WL 2448557, at *3.

dept. to make referral offenders to mental health dept, along with clear guidelines for what the actions of the mental health dept should handle both diagnos[es] and treatment. All of which were not followed with Plaintiff's case. On 9/27/2017, Plaintiff's hair fell out and had to receive a shot in his head, and was already having chest pains. Medical ran first EKG on 5/19/2017.

5) The stress of the state created danger case became more intense when his son and granddaughter [were] almost killed from Plaintiff['s] help to law enforcement. The shock was overwhelming and lead to a hunger strike on 2/25/18 and panic attacks with dizzy spells by 5/15/18.

6) By 2/7/19, Plaintiff was clearly in crisis and in Dr. Thompson's progress notes, he states he would consult with "HQ staff." On 2/15/19 Dr. Thompson wanted to know why I wasn't either going outside or showering. I told him of the panic problems. Dr. Thompson ordered the MMPI-2 test. After the test came back showing the need for treatment, he did nothing. "Note," Dr. McDuffie told me that in his career he had only seen one other person with results on that test like Plaintiff's and that they gave about 80 a year to weed out fakes. However, I was the real thing and treatment should have been given, and absolutely should have been stated in Plaintiff's file even "if" he was not "qualified" to treat Plaintiff. However, nothing was done "except" a red sticker was place[d] on Plaintiff's file that read "out of state inmate contact HQ before treating." Nothing written in Plaintiff's file and nothing in CORIS.

7) The other doctor on staff with mental health was Dr. Quinn whom I talked to from time to time and sat in on ICA meetings. She was fully aware of the case. I saw her after the test and asked what was the outcome and when would I hear from Dr. Thompson. She said she didn't know. However, as a member of the dept. she would know. I received a copy of her monitoring report dated 3/4/19 well after the test was known. Dr. Quinn's report stated no anxiety, agitation or tension, which based on the test and what she wrote that she was unable to fully assess Plaintiff, which makes no sense at all.

8) About two weeks after the MMPI-2 test was done on 2/25/2019 a "correctional interpretive test was ran" which had to have been reviewed by both BKCC staff and HQ Richmond. Which means on 3/6/19 when A.J. Williamson did Plaintiff's close out notes the correctional interpretive report was available for review. Nurse Williamson stated that Plaintiff's medical transfer form was completed after the medical record was reviewed and no meds were being sent. Both were not true. The form has nothing written as notes.

9) The mental health and medical staff failed to ensure adequate care was given or to keep a clear record of Plaintiff's medical health condition which left Plaintiff unaware of his need for treatment along with the staff at the Red Onion facility.

10) The American College of Physicians Book shows that anxiety disorders many of these symptoms can be misinterpreted as signs of a serious physical illness. []Plaintiff's symptoms of chest pains, shortness of breath, dizziness, all mislead the medical staff at Red Onion State Prison.

11) On 5/16/19, the medical staff at R.O.S.P started test on Plaintiff's heart because of the chest pains. Due to the failure of BKCC medical staff to update

CORIS with the findings from the MMDI-2 test. This failure put Plaintiff's life in danger based on Dr. Gregory Miller's statement made on the MRN: 01803968 form which states Michael Dobson has been counseled on the risk of cardiac catheterization and percutaneous coronary intervention. This includes but [is] not limited to bleeding, infection, pain, stroke, myocardial infection, death and embolus to potentially any body part and other imponderables. Also a risk of adverse drug reaction.

12) Plaintiff underwent a catheterization that was not needed. All because staff at BKCC failed to update CORIS or advise Plaintiff of the findings of the test. Also, Plaintiff had bad side effects from the procedure. Plaintiff's elbow on left arm had bad swelling with dizzy spells.

13) It was the medical staff at ROSP after the heart test came back clean. While I was still having a lot of medical problems 1) high blood pressure, 2) vertigo, and 3) globous, all of which came after the MMPI-2 test was done.

14) Ms. Jessie, the nurse practitioner, put Plaintiff on blood pressure med, then vertigo meds because Plaintiff would get dizzy when he was take[n] to outside doctor. It became clear that the panic attacks were the cause, and he was started on vertigo meds. Ms. Jessie started believing Plaintiff suffered from anxiety. She put Plaintiff in [to] see the mental health staff. When a doctor in Abingdon diagnosed Plaintiff with globous on 5/20/21. However, he didn't respond to any of Plaintiff's request form or the referral by Ms. Jessie. Plaintiff filed a complaint against Dr. McDuffie. It wasn't until 8/5/21 did Plaintiff see Dr. McDuffie. After the long delay, Plaintiff didn't trust him at first. However, he stated to Plaintiff that he worked not for D.O.C. and would do his job. Plaintiff agreed to see him again on 9/10/21. We met and went over my symptoms. See Dr. McDuffie notes written 9/10/21 and the follow up notes on 11/6/22, 2/25/22, 3/3/22, 3/11/22 and 3/25/22.

15) Over the next few meetings Dt. McDuffie and Plaintiff went through all 3 of Plaintiff's medical records. We discovered 1) that no notes were written by Dr. Thompson or Quinn on the finding of the MMPI-2 test, 2) that a big red sticker was on the file that said don't do anything with this offender without contacting "HQ Richmond" which led to Dr. McDuffie's comment that the actions of D.O.C. was a "moral injury" and that he was not a part of whatever cover-up they were up to. He also ask[ed] to be subpoenaed by this Court.

(ECF No. 35, at 4–9.)

**B. Applicable Eighth Amendment Law**

To state an Eighth Amendment claim, an inmate must allege facts showing "(1) that objectively the deprivation of a basic human need was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

Under the objective prong, the inmate must allege facts to suggest that the deprivation complained of was extreme and amounted to more than the "routine discomfort" that is "part of the penalty that criminal offenders pay for their offenses against society." *Strickler v. Waters*, 989 F.2d 1375, 1380 n.3 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). "In order to demonstrate such an extreme deprivation, a prisoner must allege 'a serious or significant physical or emotional injury resulting from the challenged conditions.'" *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (quoting *Strickler*, 989 F.2d at 1381). With respect to claims of inadequate medical treatment under the Eighth Amendment, "the objective component is satisfied by a serious medical condition." *Quinones*, 145 F.3d at 167.

The subjective prong requires the plaintiff to allege facts that indicate a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *see Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997). Thus, to survive a motion to dismiss, the deliberate indifference standard requires a plaintiff to assert facts sufficient to form an inference that "the official in question subjectively recognized a substantial risk of

harm" and "that the official in question subjectively recognized that his [or her] actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich*, 129 F.3d at 340 n.2).

In order to state an Eighth Amendment claim for denial of adequate medical care, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)), *overruled in part on other grounds by Farmer*, 511 U.S. at 837. Furthermore, in evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson*, 503 U.S. at 9 (citing *Estelle*, 429 U.S. at 103–04). In this regard, the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977).

**C. Analysis of Claim Two**

In Claim Two, Dobson states: "Denial of 8th Amendment rights: deliberate indifference to mental and medical conditions." (ECF No. 35, at 9.) Dobson claims that "Defendants" generally "allowed Plaintiff to go untreated for a mental health condition that turned into [a] serious medical health conditions." (*Id.* at 4.) Dobson identifies the "mental health conditions" as "1) PTSD, 2) panic disorder, 3) anxiety." (*Id.*) Dobson contends that the untreated mental health conditions

caused him to have "1) high blood pressure, 2) vertigo, 3) globous[8], and 4) hair loss." (*Id.*) From Dobson's allegations, it is unclear whether Dobson identifies sufficiently serious mental health or medical needs. Moreover, beyond Dobson's conclusory statement, it is also unclear whether these mental health conditions caused the medical conditions Dobson complains about.[9] Nevertheless, at this juncture and for the purposes of the Court's screening obligations only, the Court assumes that Dobson has alleged that he had sufficiently serious mental health and medical needs.

**1. Allegations Prior to February 2019**

First, Dobson alleges a series of events that occurred prior to his interactions with Dr. Thompson in February of 2019. As an initial matter, Dobson fails to allege any facts suggesting that the named Defendants had any direct involvement or personal responsibility for his medical or mental health care during that time. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Dobson does not name any specific defendant involved in his medical care prior to February 2019 but simply states "Defendants" or "mental health and medical staff." Vague references to a group of "defendants" without specific allegations tying the

[8] The Court cannot discern what Plaintiff means by "globous." If Plaintiff means "globus pharyngeus," that simply means a sensation of having a lump in the back of the throat, which is not a serious medical condition but can result from anxiety or gastroesophageal reflux disease and can be corrected through proper posture and exercises. *See* https://www.webmd.com/a-to-z-guides/best-exercises-globus-sensation (last visited May 25, 2023).

[9] The Court notes that Dobson has previously litigated claims about his medical care and the conditions of his confinement stemming from the same time period against different staff at Buckingham Correctional Center and Red Onion State Prison in the United States District Court for the Western District of Virginia. *See, e.g.*, *Dobson v. Kiser*, No. 7:19cv00755, 2021 WL 1227925, at *5 (W.D. Va. Mar. 31, 2021) (finding no deliberate indifference to serious medical needs); *Dobson v. Stolle*, No. 7:18–CV–00369, 2019 WL 2997849, at *13 (W.D. Va. July 9, 2019) (finding no constitutional violations for keeping Dobson in administrative custody and protective custody). Some of the allegations in these cases overlap and shed light on Dobson's allegations in this case.

individual defendants to the alleged unconstitutional conduct, fails to state a claim with respect to those defendants. *Cf. Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008) (citation omitted) (finding dismissal of named defendant proper where plaintiff failed to allege defendant's personal involvement in the alleged wrongdoings). Any claim from this time-period would also be untimely.[10] Thus, only allegations from the period of February 2019 forward remain before the Court.

[10] Because no explicit statute of limitations for 42 U.S.C. § 1983 actions exists, federal courts borrow the personal injury statute of limitations from the relevant state. *Nasim v. Warden*, 64 F.3d 951, 955 (4th Cir. 1995) (citing *Wilson v. Garcia*, 471 U.S. 261, 266–69 (1985)). Virginia applies a two–year statute of limitations to personal injury claims. *See* Va. Code Ann. § 8.01–243(A) (West 2022). Thus, Dobson was required to file his complaint within two years from when the underlying claims accrued.

When a 42 U.S.C. § 1983 claim accrues is dictated by federal law. *See Nasim*, 64 F.3d at 955. "A claim accrues when the plaintiff becomes aware of his or her injury, *United States v. Kubrick*, 444 U.S. 111, 123 (1979), or when he or she 'is put on notice . . . to make reasonable inquiry' as to whether a claim exists." *Almond v. Sisk*, No. 3:08CV138, 2009 WL 2424084, at *4 (E.D. Va. Aug. 6, 2009) (omission in original) (quoting *Nasim*, 64 F.3d at 955), *aff'd*, 372 F. App'x 432 (2010). Further, in order to dismiss a 42 U.S.C. § 1983 action because the applicable statute of limitations has expired, "the court must find that the expiration of the statute of limitations is clear on the face of the complaint." *In re Davis*, Nos. 4:11CV11, 4:11CV12, 4:11CV13, 4:11CV14, 4:11CV15, 4:11CV16, 4:11CV17, 4:11CV18, 4:11CV19, 4:11CV20, 2011 WL 9669470, at *2 (E.D. Va. Jan. 26, 2011) (citation omitted), *aff'd sub nom. Davis v. Wilkinson*, 443 F. App'x 812 (4th Cir. 2011). Dobson filed his complaint on March 9, 2022. Thus, Dobson's claims must have accrued before March 9, 2020. It is clear from the face of the Particularized Complaint that almost all of the actions Dobson complains about accrued in 2017 and 2019, more than two years before this action was brought. However, Dobson vaguely mentions that he only learned of the errors of Dr. Thompson and Dr. Quinn at some time in 2021 or 2022. Therefore, the Court is not inclined at this juncture to find the claims against these two Defendants untimely.

Dobson's allegations against Nurse Williamson appear to stem from conduct that took place in March of 2019. To be timely, Dobson needed to bring his claim against Nurse Williamson no later than March of 2021, which he failed to do. As discussed below, Dobson fails to state a claim for relief against Nurse Williamson, and any claim against her is also untimely. Thus, the claim against Nurse Williamson will be dismissed with prejudice because it fails to state a claim and is frivolous.

**2. Dr. Thompson**

With respect to Dr. Thompson, Dobson alleges that he failed to tell Dobson or record in his medical file the results of his "MMDI-2 mental health test" which indicated he needed treatment. (ECF No. 35, at 5.) An MMDI test appears to be a personality test, like Myers Briggs, not a mental health diagnostic tool. The Court, therefore, assumes Dobson intended to refer to a MMPI-2 test or the Minnesota Personality Inventory-2, which "is designed to aid in the assessment of a wide range of clinical conditions."[11] Generously construing Dobson's Particularized Complaint, he argues that Dr. Thompson's failure to inform Dobson of the results of the test or to record the results of the test in Dobson's medical record led to a misdiagnosis of his unidentified symptoms as heart problems several months later. (*See id.* at 19.) Although not without skepticism, the Court determines that Dobson has adequately pled a claim that Dr. Thompson was deliberately indifferent to Dobson's serious mental health needs to survive the Court's screening obligations.

**3. Dr. Quinn**

Dobson's claim against Dr. Quinn is even more vague. Dobson contends that:

> The other doctor on staff with mental health was Dr. Quinn whom I talked to from time to time . . . . was fully aware of the case. I saw her after the test and asked what was the outcome and when would I hear from Dr. Thompson. She said she didn't know. However, as a member of the dept. she would know. I received a copy of her monitoring report dates 3/4/19 well after the test was known. Dr. Quinn's report stated no anxiety, agitation or tension, which based on the test and what she wrote that she was unable to fully assess Plaintiff, which makes no sense at all.

(ECF No. 35, at 6.) Dobson also claims that in 2021 or 2022, when he was reviewing his records with a different doctor, they "discovered . . . that no notes were written by Dr. Thompson or Quinn on the finding of the MMDI-2 test." (*Id.* at 9.) The Court fails to discern, and Dobson fails to

[11] *See* https://www.upress.umn.edu/test-division/mmpi-2 (last visited May 25, 2023).

explain, how Dr. Quinn was deliberately indifferent to his serious medical or mental health needs from these allegations. At most, it appears that Dr. Quinn saw Dobson for his mental health needs, examined him, and determined that he was not experiencing symptoms of anxiety or agitation at that time. Dobson insists that this assessment was wrong because Dr. Quinn knew he needed treatment because of the results of the MMPI-2 test. (*Id.* at 20.) The Court fails to discern what treatment Dobson wanted that he was not receiving. Dobson was clearly being evaluated and treated by mental health doctors. At most, Dobson appears to disagree with Dr. Quinn's clinical opinion about his mental health and, presumably, any diagnosed treatment. Absent exceptional circumstances, however, an inmate's disagreement with medical personnel with respect to an assessment or a course of treatment is insufficient to state a cognizable constitutional claim, much less to demonstrate deliberate indifference. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)). Dobson alleges no such exceptional circumstances. Instead, Dobson states nothing more than a disagreement with Dr. Quinn's clinical opinions, and he fails to state a cognizable constitutional claim, much less a claim of deliberate indifference.

In addition, to the extent that Dobson faults Dr. Quinn for failing to make clinical notes in his medical file, that is belied by his own statement that she noted that he was not experiencing anxiety of agitation. In sum, Dobson's claim against Dr. Quinn lacks merit and will be DISMISSED WITHOUT PREJUDICE.

**4. Nurse Williamson**

Finally, with respect to Nurse Williamson, Dobson contends that:

> About two weeks after the MMDI-2 test was done on 2/25/2019 a "correctional interpretive test was run" which had to have been reviewed by both BKCC staff and HQ Richmond. Which means on 3/6/19 when A.J. Williamson did Plaintiff['s] close out notes the correctional interpretive report was available for review. Nurse

> Williamson stated that Plaintiff's medical transfer form was completed after the medical record was reviewed and no meds were being sent. Both were not true. The form has nothing written as notes.

(ECF No. 35, at 6–7.) Later, Dobson insists that Nurse Williamson's notes "were both wrong," but he fails to explain how or why. (*Id.* at 20.) To the extent that Dobson's allegations against Nurse Williamson are comprehensible, Dobson fails to allege facts that Nurse Williamson was deliberately indifferent to his serious medical conditions for filling out a form or for not filling out a form to Dobson's satisfaction. Dobson's claim against Nurse Williamson will be DISMISSED for failure to state a claim and as legally frivolous.

In sum, the following claim survives screening and remains before the Court:[12]

> Claim Two: Dr. Thompson was deliberately indifferent to Dobson's serious mental health needs when he failed to inform Dobson of, or record in Dobson's medical files, the results of the MMPI-2 test leading to later misdiagnosed health conditions.

## VII. CONCLUSION

Defendants Clarke, Herrick, Booker, Rickey White, Ann-Marie White, Mullen, Brown, Mailroom Manager, King, Collins, Cox, K-9 Officer, and Williams will be DISMISSED WITHOUT PREJUDICE. Claims One and Three will be DISMISSED WITHOUT PREJUDICE because they are improperly joined. The claim against Dr. Quinn is DISMISSED WITHOUT PREJUDICE. The claim against Nurse Williamson will be DISMISSED for failure to state a claim and as legally frivolous. The Court will continue to process remaining Claim Two against Dr. Thompson.

An appropriate Order will accompany this Memorandum Opinion.

---

[12] The Court is compelled to clearly identify the remaining claim because Dobson's complaint is filled with rambling allegations spanning from 2017 to 2022 that do not identify any personal involvement of Dr. Thompson or any deprivation of his Eighth Amendment rights.

Date: 9 August 2023
Richmond, Virginia

/s/
John A. Gibney, Jr.
Senior United States District Judge